RECEIVED
COURT OF APPEALS
JUL 0 1 2013
LISA MATZ
CLERK, 5th DISTRICT



# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. PD-0152-12

### RODNEY LAMONT HUNT, Appellant

v.

### THE STATE OF TEXAS

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW FROM THE FIFTH COURT OF APPEALS KAUFMAN COUNTY

JOHNSON, J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, KEASLER, HERVEY, COCHRAN, and ALCALÁ, JJ., joined. KELLER, P.J., dissented.

## OPINION

A jury found appellant guilty of murder and assessed punishment at 99 years' imprisonment and a $10,000 fine. On appeal, the court of appeals affirmed the judgment. *Hunt v. State*, No. 05-07-01408-CR, 2009 WL 659132 (Tex. App.–Dallas Mar. 16, 2009, pet. granted) (mem. op., not designated for publication). Appellant filed a petition for discretionary review, and this Court remanded the cause to the court of appeals to reconsider in light of our then-recent decisions in *Martinez v. State*, 272 S.W.3d 615 (Tex. Crim. App. 2008), and *Carter v. State*, 309 S.W.3d 31 (Tex.

Crim. App. 2010). *Hunt v. State*, No. PD-0995-10, 2011 WL 303815 (Tex. Crim. App. Jan. 26, 2011). The court of appeals again affirmed, inserting summarizing language from *Martinez* and *Carter* into the text of its prior opinion without further analysis. *See Hunt v. State*, No. 05-07-01408-CR, 2011 WL 6415182 (Tex. App.–Dallas Dec. 22, 2011, pet. granted) (mem. op., not designated for publication). Appellant again filed a petition for discretionary review in this Court, which we again granted. We reverse the judgment of the court of appeals and remand this cause to that court with instructions to abate to the trial court for further findings.

## Facts

Police suspected appellant of murdering his girlfriend, Kelley Osgan, but did not have sufficient evidence to charge appellant with the offense. The day after Osgan's body was found in Kaufman County, a patrol officer spoke with appellant and told him that the investigator on the case, Edward Black, wanted to talk to him. Appellant accepted a ride to the Kaufman police station. He was not in custody.

Appellant spoke with Detective Black and denied any involvement in the murder, but Black had information from other persons that indicated that appellant was lying about when he last saw Osgan. Black and appellant agreed that appellant would meet with Black a week later for another interview and a polygraph, which would take place in Mesquite, a city that lies mostly within Dallas County.

About a week later, Black and a second detective, Barker, picked appellant up, because he did not have a car, and drove him to Mesquite. After the polygraph was completed, Black and Texas Ranger Shing questioned appellant at the Mesquite police station for about one hour and fifteen

minutes, told him that he had failed the polygraph,[1] and that they had evidence that he had killed Osgan. Shing also showed appellant a photograph of Osgan that had been taken while she was alive. No *Miranda* warnings were given. At some point, appellant stopped denying involvement, became emotional, and confessed to the murder. Black took appellant back to the Kaufman police department so that appellant could make a written confession. They did not talk during the thirty-minute return trip.

Back in Kaufman, appellant went outside to smoke, then appeared to be having physical difficulties. An ambulance was called, but appellant declined treatment, told the crew that he was fine, but was "just really nervous because he was confessing to murder." Appellant said that he did not want to go to the hospital and that he did want to continue talking with Black. Black gave him time to compose himself, and Shing offered food, which appellant declined. At that point, Black informed appellant of his *Miranda* rights. After the warnings were given, appellant made another statement confessing to Osgan's murder.[2] During this interrogation, the officers referred to the first, unwarned Mesquite statement at least nineteen times.[3]

Appellant moved to suppress both statements, the first because he had not been given the

---

[1] The record does not contain testimony from the polygrapher and thus does not reflect whether appellant actually failed the polygraph. We have only a short exchange between Black and the prosecutor: "Q. And he ended up failing the polygraph and then you and Ranger Shing talked to him? A. Yes, sir." III R.R. 15.

[2] During his direct examination of Black, the prosecutor asked about the "techniques used to obtain the confession." III R.R. 15.
   Q. Now, during that interview that–I guess the main technique that y'all used with the defendant was basically saying you would tell the DA that he cooperated?
   A. That was one thing we told him, yes.
   Q. Saying the truth is going to help you out? You need to get right with God? Those kind of things?
   A. Yes, sir.

[3] The state noted those events during its direct examination of Black: "Q. So basically going back to this [Mirandized] taped interview, there's a lot of referring back to you already told me this, you just need to get this on paper?" III R.R. 17.

required warnings and the second because the police had repeatedly referred to the first statement while obtaining the second. The state responded that both statements were admissible because appellant was not in custody when he made them and, in the alternative, that any taint from the first statement was attenuated before appellant made the second, written statement. The trial court held a hearing on the motion after jury selection. On recross-examination, trial counsel emphasized the frequent references to the Mesquite statement while Black and Shing were obtaining the Kaufman statement.

Q. Detective Black, whenever you were talking to Mr. Hunt at the Kaufman police station, I think you told us that sometime throughout that conversation you had to make reference to Mr. Hunt about what he had told you earlier back at the Mesquite station.

A. That's true.

Q. And you did that fairly often?

A. Yes, sir.

Q. Would you do that or did you do that whenever he told you something different at the Kaufman police station than what he had told you at the Mesquite police station?

A. Yes, I did.

Q. Something to the tune of now that's not what you told us at the Mesquite station?

A. Yes, sir.

Q. Or you told us something different at the Mesquite station? And Mr. Hunt would give a response to your statement to that?

A. That's correct.

Q. Okay. So it would be–it would be fair to say that throughout the conversation you had at the Kaufman police station you were making references to the conversation you had with Mr. Hunt at the Mesquite station?

A. Yes, sir.

Q. Either correcting him on what he—correcting him on the story that he was now telling at the Kaufman station or clearing up something that he told you at the Mesquite station?

A. Yes, sir, it was done in the context to get the truth, trying to figure out what exactly was the truth.

Q. And then from that conversation at Kaufman station the result was the written statement that we have in front of us right now?

A. Yes, sir.

III R.R. 27-28.

During the suppression hearing, the trial court questioned Black about the trip to Mesquite and the events there.[4] After argument,[5] the trial court denied appellant's motion to suppress as to both statements. At trial, the state introduced only the second statement.

After he was found guilty, appellant moved for a new trial, and the trial court held a hearing. The trial court's written findings of fact and conclusions of law found that the first statement, in Mesquite, was the result of custodial interrogation because, in the audio statement made in Mesquite, an officer told the appellant "that if he thinks he is going to get home by continuing to deny his involvement he is mistaken because they already have enough on him." The trial court found, "At this point a reasonable person would not feel that he was free to leave." It also found that the interview was conducted without the required *Miranda* warnings. But the trial court, in ruling on a claim "urging primarily ineffective assistance of counsel," also found that the second statement,

---

[4] In response to questioning by the trial court about whether appellant knew, in Mesquite, that he was free to leave, Black mistakenly responded by reciting events—appellant's panic attack and the call for an ambulance—that took place after the return to Kaufman.

[5] Defense counsel argued that the statements were inadmissible because they did not meet the requirements of Tex. Code Crim. Proc. Art. 38.22, *Miranda v. Arizona*, or the United States and Texas constitutions. The state argued that the statements were admissible and cited to *Ickes v. State*, No. 01-96-01540-CR, 1998 WL 734014 (Tex. App.—Houston [1st Dist.] Oct. 22, 1998, pet. ref'd) (mem. op., not designated for publication).

in Kaufman, was not tainted by the Mesquite statement and denied the motion for new trial.

Some of the trial court's findings of fact are not supported by the record, the most important of which is that the trial court misunderstood the order of events and the places in which they occurred.[6] However, the trial court's conclusion on the separate issue of appellant's trial attorney's ineffectiveness is supported by the record, if not by the reasoning of the trial court in coming to that conclusion.

## 1. Preliminary Legal Principles and Relevant Law

Appellant contends that his Fifth Amendment rights were violated because the police who interviewed him intended to circumvent *Miranda* by employing a deliberate two-step questioning strategy. The state argues that appellant failed to preserve this issue for appellate review, and in the alternative, that this Court should remand to the court of appeals to determine whether the claim was preserved, and if it was, whether the police strategy was intended to circumvent *Miranda*. We begin with an overview of the relevant law.

### A. *Miranda*

The Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, commands that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V & XIV, § 1; *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). The protection against self-incrimination is violated when law enforcement has elicited

---

[6] After finding that appellant was in custody in Mesquite, the trial court found that the "interview is terminated and paramedics are called to examine the Defendant to see how he is doing. A medic asks the Defendant if he is all right and he says he is about to confess to murder. An officer offers to take the Defendant home. The Defendant says he wants to get things over with. The Defendant is then taken from the Mesquite police station to the police station in Kaufman."

According to the record however, the Mesquite interview was terminated, and they all returned to Kaufman, where appellant had a panic attack. Black called for paramedics, who came and checked on appellant. He told them that he was "just really nervous because he was confessing to murder." III R.R. 198.

an involuntary confession from a criminal defendant. *Bram v. United States*, 168 U.S. 532, 542 (1897); *Rogers v. Richmond*, 365 U.S. 534, 544 (1961). Under the landmark *Miranda* decision, a confession is presumed to be involuntary if it was made pursuant to a custodial interrogation and without adequate warnings to protect the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966).[7] Unwarned confessions are accorded this presumption because "'the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk' that the privilege against self-incrimination will not be observed." *Carter*, 309 S.W.3d at 35 (quoting *Dickerson v. United States*, 530 U.S. 428, 435 (2000)). The admissibility of a custodial confession is conditioned upon warning a suspect of his rights; failure to provide the warnings and obtain a waiver usually means that the confession will be excluded at trial. *Id.* at 35-36 (*citing Miranda*, 384 U.S. at 467).

## B. *Elstad* and *Seibert*

After *Miranda*, the question arose as to whether warned confessions that followed unwarned confessions are still admissible. In *Oregon v. Elstad*, the Supreme Court addressed "whether an initial failure of law enforcement officers [to administer *Miranda* warnings], without more, 'taints' subsequent admissions made after a suspect has been fully advised of and has waived his *Miranda* rights." *Oregon v. Elstad*, 470 U.S. 298, 300 (1985). Elstad was questioned in his own home about the burglary of a neighbor's residence. Elstad admitted that he was involved, and he was then

---

[7] *Miranda* requires that "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444.

arrested and transported to the county sheriff's office. There, deputies read Elstad his *Miranda* warnings, and he gave a full statement admitting to the burglary. The Supreme Court upheld the admission of Elstad's confession, reasoning that this situation had "none of the earmarks of coercion," and "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary." *Id.* at 316, 318. The *Elstad* Court listed factors to be used to determine whether there was a coercive effect, or "taint" from the unwarned statement on the warned statement: "the time that passes between confessions, the change in place of interrogations, and the change in the identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Id.* at 310.

In 2004, the Supreme Court addressed whether *Miranda* is violated when police elicit an unwarned confession from a suspect, and then the interrogating officer warns the suspect and "leads the suspect to cover the same ground a second time," resulting in a second, Mirandized, confession. *Missouri v. Seibert*, 542 U.S. 600, 604 (2004). This tactic is referred to as "question-first, warn-later." *See id.* at 610. A fractured court held that there was a *Miranda* violation, with four justices joining the plurality opinion, and two justices writing separate concurring opinions. The plurality employed a multi-factor test to determine whether the *Miranda* warnings could have still been effective and held that, "because the facts here do not reasonably support a conclusion that the warnings given could have served their purpose," the post-warning statements were inadmissible. *Id.* at 617. In a concurrence, Justice Kennedy argued that "the admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless [a] deliberate two-step strategy [to undermine the *Miranda* warning] was employed." *Id.* at 621 (Kennedy, J., concurring).

### C. "Question-first, Warn-later" in Texas

This Court adopted Justice Kennedy's analysis in subsequent decisions. *See Martinez*, 272 S.W.3d at 623; *Carter*, 309 S.W.3d at 37-38. Thus, in Texas, when a defendant has been given midstream *Miranda* warnings, a trial court ruling on a motion to suppress the post-*Miranda* statement on the grounds that it was involuntary is faced with the threshold question of whether the questioning officer engaged in a deliberate two-step questioning strategy. *See Carter*, 309 S.W.3d at 38. If the trial court finds that the officer engaged in a deliberate two-step questioning strategy, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made."[8] *Martinez*, 272 S.W.3d. at 626 (quoting *Seibert*, 542 U.S. at 619 (Kennedy, J., concurring)). If the trial court finds that the officer did not engage in a deliberate two-step strategy, the question of whether the post-*Miranda* statement was voluntary is analyzed under the *Elstad* factors.

## 2. Analysis

### A. Preservation

We first address the main issue in the state's brief: whether appellant preserved his *Seibert* complaint. The state argues that appellant merely raised an *Elstad* issue of whether the second statement was voluntary and did not raise a *Seibert* deliberateness issue in the trial court or the court of appeals.[9] Thus, according to the state, appellant failed to preserve the issue that is presently before

---

[8] Curative measures taken from the *Seibert* opinion and suggested by the *Martinez* court include: "(1) a substantial break in time and circumstances between the unwarned statement and the *Miranda* warning (Kennedy); (2) explaining to the defendant that the unwarned statements, taken while in custody, are likely inadmissible (Kennedy); (3) informing the suspect that, although he previously gave incriminating information, he is not obligated to repeat it (plurality); (4) the interrogating officers refrain from referring to the unwarned statement unless the defendant refers to it first (plurality); or (5) if the defendant does refer to the pre-*Miranda* statement, the interrogating officer states that the defendant is not obligated to discuss the content of the first statement (plurality)." *Martinez*, 272 S.W.3d at 626-27.

[9] *See* discussion of *Elstad* and *Seibert*, *supra* Sec. 1B.

this Court, and we should dismiss appellant's petition as improvidently granted. We disagree.

To preserve an issue for appellate review, a defendant must first raise that issue in the trial court. TEX. R. APP. PROC. 33.1. Eschewing hyper-technical requirements for preservation, we have stated that "all a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992). Appellant properly raised the issue of voluntariness in the context of the midstream warnings in the trial court and the court of appeals, and by doing so, he preserved his deliberateness complaint.

We observe that, at the time of his trial and while he was pursuing a direct appeal, this Court had not yet adopted Justice Kennedy's approach in his *Seibert* concurrence.[10] A finding of deliberate circumvention of *Miranda* was not clearly required in Texas until *Martinez*.[11] Therefore, all appellant needed to raise in the trial court and the court of appeals was a voluntariness issue in light of appellant's being given midstream *Miranda* warnings.

At trial, appellant filed a motion to suppress that alleged "any statements made by [appellant] were involuntary and coerced and enticed from [appellant]." Appellant also alleged that "the statements made by [appellant] were tainted by the illegal and unlawful detention and arrest" in violation of his rights under the United States and Texas Constitutions and Article 38.23 of the Texas Code of Criminal Procedure. The trial court held a hearing on the motion, during which appellant

---

[10] *Martinez*, 272 S.W.3d 615, was decided December 17, 2008. Judgment in this case was entered October 11, 2007, and appellant filed his brief in the court of appeals on June 15, 2008.

[11] This is why in 2009, when appellant filed his first petition for discretionary review in this Court, we remanded to the court of appeals to reconsider in light of *Martinez* and *Carter*.

extensively questioned the officers about how they used the unwarned Mesquite statement to elicit the second, warned, Kaufman statement. Following the guilty verdict, appellant filed a motion for new trial alleging ineffective assistance of counsel. In its findings on the motion, the trial court found that "the second confession is not so tainted as to make it inadmissible."

In his direct appeal, appellant argued that the second confession was tainted by the first and also that the interrogating officers employed an impermissible "question-first, warn-later" technique. Appellant specifically cited *Seibert* for the latter complaint, as well as *Martinez*, as that case was pending in this Court at the time. The court of appeals recognized that appellant had raised a *Seibert* issue and cited to that case in its analysis in both its 2009 and 2011 opinions. *See Hunt*, 2011 WL 6415182 at *6; *Hunt*, 2009 WL 659132 at *5. Clearly, that court had notice of appellant's *Seibert* complaint in the context of the voluntariness issue.

We find that appellant properly preserved his *Seibert* issue for appellate review.

## B. Deliberateness

We next address appellant's sole issue: whether the court of appeals's holding conflicts with *Martinez* and *Carter*.[12] Appellant argues that police employed a deliberate two-step questioning strategy to circumvent *Miranda* and then failed to take curative measures to ensure that appellant would understand the "import and effect of the *Miranda* warning and of the *Miranda* waiver." We begin with the threshold issue of whether the police employed a deliberate two-step questioning strategy. *See Carter*, 309 S.W.3d at 38.

---

[12] As stated in appellant's petition for discretionary review: "whether the Court of Appeals holding conflicts with this Court of Criminal Appeals'[s] holding in *Martinez v. State* and *Carter v. State* by finding police did not use a deliberate two-step interrogation technique to circumvent *Miranda* to obtain a second confession?" We note that the court of appeals did not explicitly determine whether the police used a deliberate two-step strategy. Instead, the court affirmed on the basis that "appellant's second confession was not so tainted as to make it inadmissible." 2011 WL 6415182 at *9.

Whether the two-step questioning strategy was deliberate hinges on the interrogating officer's subjective intent. *Carter,* 309 S.W.3d at 39. When the officer testifies at a hearing on a motion to suppress, the officer's demeanor and testimonial evidence "are especially relevant to a deliberateness determination." *Id.* at 40. Thus, when the trial court, after having the chance to observe the officer's testimonial evidence and demeanor, has made an explicit factual finding regarding the deliberateness of the strategy, a reviewing court must employ a deferential standard of review and may reverse only upon a showing of abuse of discretion. *Id.* at 40-42. If the trial court did not make explicit findings regarding deliberate use of a "question-first warn-later" strategy, a reviewing court may find that the officer employed such a deliberate two-step questioning strategy if it is clear from the facts in the record. *See Martinez,* 272 S.W.3d at 624.

In *Martinez,* the defendant was arrested for his involvement in a robbery and murder. He was not given *Miranda* warnings upon arrest, but was brought to police headquarters, questioned about the crimes, given a polygraph, and told he failed the polygraph. This process took 3-4 hours. Police officers then took Martinez to a municipal court magistrate, who gave Martinez the *Miranda* warnings. *Id.* at 618. This Court found that "the absence of *Miranda* warnings at the beginning of the interrogation process was not a mistake based on the interrogating officers' mistaken belief that appellant was not in custody, but rather a conscious choice." *Id.* at 624. Since no curative measures were taken to offset the damage done by the failure to warn at the outset, the second statement given to the police was involuntary and should have been excluded.

Appellant argues that the trial court's finding that appellant was in custody when he gave the first statement should compel us to conclude that the trial court found that police deliberately employed the two-step questioning strategy. Appellant contends that the trial court made a

credibility determination against the officers "in specifically finding that Appellant was in custody at the time of his first pre-*Miranda* interrogation by police despite the interrogating officer's characterization to the contrary,"[13] and therefore, "the deliberate two-step process was at work." However, the trial court's finding that appellant was in custody in Mesquite is not necessarily a credibility determination against the officer; the trial court may have believed that circumstances that surrounded the Mesquite statement led the officers to a mistaken belief that appellant was not in custody. The record does not reveal information on that issue. And even if the trial court did make a credibility determination against the officers as to the issue of custody, it does not necessarily mean that the trial court believed that the officers were employing a deliberate strategy to circumvent *Miranda*.

The trial court in this case made no findings to which we must defer regarding the deliberateness issue. It is also not clear from the record before us whether the officers employed a deliberate two-step strategy to circumvent *Miranda*. Although the trial court stated its reasons for finding that appellant was in custody when he took the lie-detector test and confessed for the first time, the basis for its second ruling–that the Kaufman statement was not tainted by the lack of warnings before the Mesquite statement–appears to have been evidence in regard to the separate issue of ineffective assistance of counsel. If the trial court considered appellant's claims of a deliberate two-step strategy of "question-first, warn-later" under *Martinez* and *Seibert* and made a ruling on that basis, it is not in the record.

---

[13] Appellant is referring to the trial court's finding that "a reasonable person would not feel that he was free to leave" after appellant was given the lie-detector test, told by police he "failed" the test, and "that if he thinks he is going to get to go home by continuing to deny his involvement he is mistaken because they already have enough on him." I C.R. 69.

### 3. Conclusion

Because the trial court did not make any findings as to whether the police employed a deliberate two-step strategy to circumvent *Miranda*, and the record is not clear on that issue, we remand to the court of appeals with instructions to abate this cause to the trial court so that it may make findings as to the applicability of *Martinez* and *Carter*, which shall be forwarded to the court of appeals.

Delivered: June 26, 2013
Do not publish