**Affirmed and Opinion filed May 21, 2019.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-17-00893-CR

_____

**LESLIE RAY FOSTER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 10th District Court
Galveston County, Texas
Trial Court Cause No. 16-CR-1600**

## OPINION

Appellant made custodial statements to two different interrogators in two different settings, but only the second interrogator warned appellant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Appellant moved to suppress both of his statements, claiming that the interrogators had circumvented *Miranda* by subjecting him to the two-step technique that is sometimes known as "question first, warn later." In response to appellant's motion, the State stipulated that certain pre-*Miranda* statements were inadmissible, but it argued that the post-*Miranda*

statements should be admitted because appellant voluntarily waived his rights under *Miranda*. The trial court agreed with the State and denied appellant's motion to suppress. Appellant now complains of that ruling in this appeal from his conviction for theft. For reasons explained more fully below, we conclude that the trial court's ruling was not an abuse of discretion.

## I. The Arrest

In the early hours of the morning, several men broke into a motorcycle shop by sawing through a metal wall panel. The break in was immediately detected by an alarm company, which promptly notified the police.

The police raced to the scene with their sirens off, hoping to establish a perimeter before engaging the burglars. When they arrived, the police found appellant standing out front and serving as a lookout. Appellant initially ran away, but then he turned around and walked towards the police with his hands up. The police saw a black object in appellant's hand (later determined to be a cellphone) and ordered appellant to stop and get on the ground. When appellant failed to follow these instructions, he was tackled by an officer and a detective, the two individuals who would later interrogate him.

Appellant was arrested, handcuffed, and secured in the backseat of a patrol car, but according to the officer who arrested him, he was not warned of his rights because the scene was still active. The remaining burglars had taken off on foot, and the police were still searching for them in a nearby field. The police called in a canine unit to aid in the search, and as that search continued, appellant was transported to the police station for processing.

## II.  The Custodial Statements to the Officer

The officer who arrested appellant also transported him to the police station. The officer's patrol car was equipped with an interior video camera, which recorded his interaction with appellant.

The camera recorded roughly thirty-seven minutes of footage, beginning with the officer's race to the motorcycle shop. Appellant was apprehended approximately five minutes into the recording, and he was secured in the backseat of the patrol car another five minutes after that. He then sat alone for the next seventeen minutes as the police continued to search the scene.

The officer returned to his patrol car at about the twenty-seven minute mark, and then he drove away without making any comments to appellant. The detective was not present at this time.

The officer drove in silence for a full minute, and then appellant broke that silence by asking, "Did y'all get him?" The officer tersely responded, "Working on it." When appellant asked, "Huh?" the officer explained that there were two dogs on the scent, and that "he's gonna get bit."

The officer then began his own series of questions, asking appellant whether he lived in the La Marque area, where the motorcycle shop was located. Appellant answered that he was from Houston, but that he happened to be in the La Marque area that evening. Without providing full context to his answer, appellant added that "they came down to pick [him] up" and asked him "to stand out there and wave for them." The officer asked how many other men were out there, and appellant said "about seven." The officer continued, "Where did all the rest of them go?" Appellant answered, "They seen y'all coming."

3

For the next minute, the officer drove in silence, and then appellant restarted the conversation. "How many did they apprehend?" he asked. The officer said, "You're the first." Appellant continued, "What were they actually trying to do?" The officer responded, "What everybody else does there in the middle of the night— trying to steal shit." When appellant asked what they were specifically trying to steal, the officer said, "All that place has got is ATVs and bikes."

At that point, appellant heard over the officer's radio that only two men were seen running away, and one of them was wearing a white shirt, while the other was wearing all dark clothing. Appellant then volunteered, "Oh that's the one they call Joe. He had on all black. . . . And the white shirt. That's Joe and George." The officer asked whether those suspects were from the local area or from Houston, and appellant said he did not know, but that they had picked him up. Appellant added, "So that's what they were up to."

After receiving another update over the radio, the officer told appellant that the dogs were closing in on the other burglars and that "somebody's about to get bit." The officer then asked, "So how'd you get blood on your hands?" Appellant said, "My knife," which he indicated he had "probably dropped."

After another extended period of silence, appellant asked, "What actually did they do though? That's what I'm trying to figure out." The officer responded, "That's what we're still trying to figure out. We're just trying to get everybody caught. Then we can go back and find everything."

The conversation concluded after that, with appellant being removed from the patrol car. In all, the conversation lasted less than ten minutes.

### III.    The Custodial Statements to the Detective

Between one and two hours later, in a designated interrogation room at the police station, appellant consented to give a recorded statement to the detective, who was the other person who had apprehended him. The officer who had previously transported appellant to the police station did not attend the interrogation.

The detective began by asking for appellant's biographical information, including his date of birth, address, and phone number. This information was transcribed on a form that warned appellant about giving a false statement to a peace officer. That form was read to appellant, along with a separate form warning appellant of his rights under *Miranda*. Appellant signed the *Miranda* form and agreed to waive those rights.

The detective then proceeded to interrogate appellant about his involvement in the burglary, beginning with why appellant was in La Marque in the first place. Appellant said that he came down to the area to see his girlfriend, who he later admitted was a prostitute. He then said that he was approached by some "dudes" outside her apartment complex, and they promised that they would "hook [him] up with another female . . . and $100" if he "gave them a hand." Appellant explained that the men did not really need help with anything. They just wanted him to stand in a location at some distance away from the motorcycle shop and, if he saw anything, to run towards a building with the light activated on his cellphone.

Appellant said that he suspected that the other men were "up to something," but he claimed that he did not know specifically that they were stealing motorcycles. He also denied ever hearing or seeing them as they sawed through the walls of the motorcycle shop.

Appellant informed the detective that there were about six burglars, and that they were members of the Blood gang. He identified two of them by name, describing the same Joe and George that he had mentioned to the officer in the patrol car. Appellant asked if any of them had been caught, and the detective said that he did not know because he had turned off his radio.

Appellant also asked whether he was going to be charged with anything, and the detective said that he was still trying to determine appellant's involvement in the crime. Though he described himself as a "crash dummy," appellant essentially claimed that he had been set up to be the fall guy.

The interrogation ended after that, having lasted roughly forty minutes. Not once during the interrogation did the detective ever refer to a statement that appellant made to the officer.

## IV.    The Motion to Suppress

Appellant filed a written motion to suppress, but he did not specifically complain of an impermissible two-step interrogation. Instead, he generally argued that his statements were involuntary because they were made without the benefit of counsel, because they were tainted by an illegal arrest, and because they were taken in violation of article 38.22 of the Code of Criminal Procedure.

The trial court conducted a brief hearing on the motion outside the presence of the jury. The only witnesses who testified at that hearing were the officer and the detective.

The officer testified that the motorcycle shop has had a long history of break ins. He described the police effort to establish a perimeter and capture the burglars. He also said that he arrested appellant without warning him of his *Miranda* rights because there was still an ongoing search for the remaining burglars.

6

The officer claimed that he did not engage appellant in any conversation until appellant asked whether another person had been caught. Even though the officer knew that appellant had not been warned of his rights under *Miranda*, the officer never explained (nor was he asked to explain) why he began to question appellant about the circumstances of the burglary.

The detective testified that he did not accompany appellant in his transport to the police station. The detective also testified that appellant never complained of pain or asked for medical attention during his interrogation, even though appellant had been tackled at the scene of the crime. The detective said that appellant had been given the opportunity to use the restroom and to get something to drink before the interrogation. The detective further said that appellant appeared to fully understand that he had waived his rights under *Miranda*.

At the close of the hearing, defense counsel orally argued that the statements should be suppressed because of an illegal two-step interrogation, citing *Martinez v. State*, 272 S.W.3d 615 (Tex. Crim. App. 2008). In response, the State stipulated that appellant's pre-*Miranda* statements were inadmissible, except for those statements that were not precipitated by a question from the officer. As for appellant's other statements to the detective, the State argued that those statements should be admitted because appellant voluntarily waived his rights under *Miranda*. The State also distinguished *Martinez* on the facts: in that case, the same interrogators attended the same interrogations at the same time, and they administered the *Miranda* warnings midstream; whereas in this case, the interrogators at each interrogation were different, and there was no showing that the second interrogator even knew that the first interrogation had taken place.

## V.    The Trial Court's Ruling

The trial court denied the motion to suppress and made oral and written findings.

In the oral findings, the trial court determined as follows:

> All right. What we have here is a two-step situation or the question first situation that you see sometimes. In this case the Defendant initiated the conversation with the officer in the car. It was not a true interrogation. Nothing from that conversation came out in the second one of any substance that I observed.
>
> You have two different people. It's a stretch to say that the questioning by, or conversation between [the officer] and the Defendant while he's driving is an interview. So, I do believe that the correct approach is as we have done, to disregard the questions and answers given during that drive, but that the examination [by the detective] was given freely and voluntarily. And so, the Motion to Suppress will be denied.

The trial court did not elaborate on the claimed two-step interrogation in its written findings, though it did determine in pertinent part that the officer and the detective were credible witnesses; that the detective was polite and conducted himself in a professional manner; that appellant did not seem intimidated or coerced by the detective when appellant voluntarily signed the form waiving his rights under *Miranda*; and that during the interrogation, appellant never expressed a desire to not speak with the detective or to withdraw the waiver that he had previously signed.

## VI.   Applicable Law

When a defendant receives midstream *Miranda* warnings and then later moves to suppress his post-*Miranda* statements, the threshold question for the trial court to decide is whether the interrogator deliberately employed a two-step "question first, warn later" strategy. *See Carter v. State*, 309 S.W.3d 31, 38 (Tex. Crim. App. 2010) (adopting Justice Kennedy's concurring opinion in *Missouri v.*

8

*Seibert*, 542 U.S. 600 (2004) (plurality)). If the two-step strategy was deliberate, then the trial court must suppress any post-*Miranda* statements that were related to the substance of the pre-*Miranda* statements unless curative measures were taken before the defendant made his post-*Miranda* statements. *Id.* at 37. If the two-step strategy was not deliberate, then the post-*Miranda* statements may be admitted if the defendant voluntarily waived his *Miranda* rights after the initial *Miranda* violation. *Id.* at 41.

## VII.  Deliberateness

Whether the two-step strategy was deliberate depends on the interrogator's subjective intent. *Id.* at 39. That determination often turns on the credibility of the interrogator in light of the circumstances surrounding the interrogation. *Id.* Because the trial court is in a unique position to gauge the interrogator's credibility, we, as the reviewing court, apply a highly deferential standard of review, reversing the trial court's ruling only if it amounts to a clear abuse of discretion. *Id.* at 40.

This case involves two interrogators (the officer and the detective), but as appellant correctly observes, we are only concerned with the subjective intent of the officer (rather than the detective), because it was the officer's questions that preceded the *Miranda* warnings.

The trial court did not explicitly address the officer's intent in its findings of fact. Instead, the trial court determined that the officer had not engaged in a "true interrogation" and that it would be a "stretch" to label his questioning as an actual interview.

The officer's questions did amount to an interrogation, however, and they violated *Miranda*, which is why the State stipulated that appellant's answers must be excluded. *See State v. Cruz*, 461 S.W.3d 531, 536 (Tex. Crim. App. 2015) ("In

9

the *Miranda* context, 'interrogation' means 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response.'"). Nevertheless, by characterizing the officer's questions as something less than a true interrogation, and by rejecting appellant's claim of a "two-step situation," the trial court implicitly found that the officer did not deliberately engage in a two-step strategy, and that his violation of *Miranda* was merely inadvertent. That implied finding is supported by the evidence that the colloquy between appellant and the officer was initiated by appellant, not the officer, and that the officer's follow-up questions were conversational in nature. *See Carter*, 309 S.W.3d at 40–41 (upholding a finding that a two-step strategy was not deliberate because the interrogator's colloquy was conversational).

The trial court's implied finding is also supported by the evidence that the officer was not present for the detective's interrogation and, vice versa, the detective was not present for the officer's interrogation. Indeed, because there is no evidence that the officer knew that appellant would be interrogated by the detective (or in the case of the detective, that appellant had already been interrogated by the officer), the trial court could have reasonably determined that the officer did not intend to employ a two-step strategy by undermining *Miranda*.

Appellant argues that there was coordination between the officer and the detective because they were both involved in appellant's arrest, they both spoke to each other after the arrest and before appellant's transport, and they both interrogated appellant close in time. These facts alone do not prove that the officer harbored an intent to employ a two-step strategy. There was no direct evidence that the officer and the detective had hatched a plan to violate *Miranda* when they spoke to each other after appellant's arrest and before his transport. Similarly, there was no evidence that the officer and the detective spoke to each other at the police station

10

following the officer's initial interrogation. And during the detective's follow-up interrogation, the detective never referred to any specific statements that appellant had made to the officer. On this record, the trial court was not required to find that the officer had coordinated with the detective to employ a two-step strategy.

Appellant argues next that the officer's intent to employ a two-step strategy is apparent on the face of the record because the officer knew that appellant was under arrest but the officer interrogated him anyways. This argument also fails. The arrest establishes that a *Miranda* violation occurred, but it does not establish as a matter of law that the officer intended to employ a two-step strategy by violating *Miranda*. *Id.* at 33 (upholding a finding that a two-step strategy was not deliberate even though the interrogator began his questioning by asking "Y'all know what you are under arrest for, right?").

Appellant also likens his case to *Martinez*, but the facts of that case are remarkably different. The initial interrogation there occurred at police headquarters after the issuance of an arrest warrant, and the interrogators engaged in deception after a span of several hours to coerce the defendant's incriminating statement. *See Martinez*, 272 S.W.3d at 618. Under those circumstances, the Court of Criminal Appeals held that the interrogators' failure to advise the defendant of his rights under *Miranda* was a "conscious choice," not a mistaken belief that the defendant was not in custody. *Id.* at 624. By contrast, there was no arrest warrant or police deception in this case, and the initial interrogation occurred during a brief ten-minute transport in a patrol car, when the officer and appellant were not even looking at each other face-to-face. On these facts, the trial court had the discretion to determine that the officer's violation of *Miranda* was merely inadvertent and that, unlike in *Martinez*, the officer did not intend to employ a two-strap strategy.

Because the record supports the trial court's implied finding that the two-step strategy was not deliberate, we need not consider appellant's arguments about the effectiveness of any curative measures. We consider instead whether appellant voluntarily waived his rights in his subsequent interrogation after being warned of those rights by the detective.

## VIII. Voluntariness

The trial court expressly found in its findings of fact that appellant understood his *Miranda* rights and that he voluntarily agreed to waive them when he spoke with the detective. We review this finding for an abuse of discretion. *See Carter*, 309 S.W.3d at 41–42.

The video recording from the detective's interrogation shows that the detective was neither intimidating nor coercive, but rather "polite" and "professional" as the trial court described. The detective spoke calmly to appellant, and he removed appellant's handcuffs at the beginning of the interrogation so that appellant could sign the form where he agreed to waive his rights. The handcuffs stayed off for the remainder of the interrogation.

Appellant was cooperative during the interrogation. He answered affirmatively when the detective asked whether he understood his *Miranda* rights, and his answers to the detective's questions about the crime were coherent and responsive. As the trial court found, there is nothing from the interrogation indicating that appellant made his statements against his own will, or that he expressed a desire to withdraw the waiver that he had previously signed.

Appellant argues that his post-*Miranda* statements to the detective were involuntary because they were a continuation of his pre-*Miranda* statements to the officer. This argument turns on a mixed question of law and fact, and under the

12

governing standard, "the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *See Oregon v. Elstad*, 470 U.S. 298, 318 (1985). The factors to be considered in this examination are "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators." *Id.* at 310; *see also Hunt v. State*, No. PD-0152-12, 2013 WL 3282973, at *4 (Tex. Crim. App. June 26, 2013) (not designated for publication) ("If the trial court finds that the officer did not engage in a deliberate two-step strategy, the question of whether the post-*Miranda* statement was voluntary is analyzed under the *Elstad* factors.").

Here, the evidence showed that the detective's interrogation occurred between one and two hours after the officer's interrogation. The evidence also showed that the locations of the two interrogations were different: the detective's interrogation was more typical, occurring in a designated interrogation room at the police station; whereas the officer's interrogation was less typical, occurring in a moving patrol car. And the identity of the interrogators was not continuous: the detective was not present for the officer's interrogation, and the officer was not present for the detective's interrogation. In light of these various separations, the trial court could have reasonably determined that appellant voluntarily waived his rights because he understood that the detective's interrogation was not a continuation of the officer's interrogation.

In one final issue, appellant contends that his post-*Miranda* statements were involuntary because he was suffering from untreated schizophrenia. Appellant did not raise this issue in his written motion to suppress, nor did he develop any evidence or present any argument relating to this issue at the live hearing on the motion to suppress. The State did not address this issue either. Because the issue was never

brought to the attention of the trial court, we conclude that it was not preserved. *See Vasquez v. State*, 483 S.W.3d 550, 554–55 (Tex. Crim. App. 2016).

Even if this issue had been preserved, we would overrule it. The voluntariness of a statement given by a person with a mental illness is reviewed under the totality of the circumstances, which is the same standard that applies to persons with regular mental capacities. *See Delao v. State*, 235 S.W.3d 235, 241 (Tex. Crim. App. 2007).

The video evidence does not reflect that appellant exhibited any obvious signs of mental illness during the detective's interrogation. Appellant spoke clearly and concisely. His answers were responsive and focused. The detective also testified that appellant appeared to be comfortable and that he never asked for medical attention. Based on the totality of the circumstances, the record supports the trial court's finding that appellant voluntarily waived his rights under *Miranda*. *See Umana v. State*, 447 S.W.3d 346, 353–58 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (upholding a trial court's finding that a waiver was voluntary, despite a claim of untreated mental illness, where there was evidence that the defendant "knew what he was talking about," "seemed to understand what the officer was asking him," "[did] not appear as though he's in any way delusional," and "didn't appear to be hallucinating").

## IX.    Conclusion

The trial court's judgment is affirmed.


/s/     Tracy Christopher
Justice


Panel consists of Justices Christopher, Jewell, and Hassan.

Publish — Tex. R. App. P. 47.2(b).